## ROUNDTREE v. SMITH & Another.

IN ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF WISCONSIN.

Decided April 16th, 1883.

*Evidence.*

When the question at issue is whether certain contracts for the sale and purchase of merchandise were gambling, and the defendant who impeaches

them in his pleadings, says as a witness testifying about them, " I could not say that I had any understanding on the subject of the nature and character of the board of trade deals, whether the property was to be actually delivered or whether it was be settled for," the court rightly instructed the jury that there was no evidence in regard to this issue which they could consider.

Action to recover moneys paid out and expended by the plaintiffs below to the use of the defendant below. The second count in the complaint set forth :

" That the said plaintiffs during the time hereinafter mentioned were and are copartners in business in the city of Chicago and State of Illinois under the name and style of Smith & Lightner, and engaged in purchasing and vending grain, pork and lard, and transacting a general commission business as commission merchants.

" That on or about the second day of February, 1879, at the city of Chicago aforesaid, said defendant employed said plaintiffs, as such copartners as aforesaid, to purchase large quantities of grain of various kinds and pork and lard for him and to make thereon certain advances of money to and for the use and benefit of said defendant, and also to make sales of said grain, pork and lard for him ; and that in consideration of such purchases, and making such advances by said plaintiffs to and for the use and benefit of said defendant, and for making such sales, he agreed to pay and allow them certain reasonable commissions by way of compensation on all such purchases so made by them for him, and on all sales so made by them for him as aforesaid.

" That under and pursuant to such employment they, said plaintiffs, in good faith and in the usual course of business, purchased for said defendant, at divers times between the first day of February, 1879, and the twenty-ninth day of April, 1879, large quantities of wheat, pork, lard, oats and corn, to wit, sixteen thousand seven hundred fifty barrels pork, twenty-two hundred fifty tierces of lard, forty thousand bushels of wheat, twenty thousand bushels of oats, and fifty thousand bushels of corn, and made advances thereon for said defendant, which advances amounted in the aggregate to the sum of nine thousand five hundred six dollars and twenty-five cents, and that during the time aforesaid they sold,

under and pursuant to the directions and authority of said defendant, all of said lard, pork, wheat, oats and corn for said defendant.

"That their services in the purchase of said pork, lard, wheat, oats and corn, and making sales thereof, and in making such advances as aforesaid, were reasonably worth the sum of twelve hundred forty-three dollars and seventy-five cents.

"That during the time aforesaid the defendant paid, to apply thereon, and was credited by said plaintiffs with divers sums of money, amounting in the aggregate to the sum of five thousand three hundred thirty-seven dollars and fifty cents.

"That all of said business transactions were concluded by the sale of the last part of said property on the 29th day of April, 1879; that on that day, after making such last sale and giving the defendant the benefit of all the credits to which he was entitled, there remained due and owing to said plaintiffs from said defendant for such advances so made as aforesaid, and for their commissions on such purchases and sales as aforesaid, the sum of five thousand four hundred twelve dollars and fifty cents, which now remains due and unpaid."

The answer admitted the partnership and the employment of the firm, and said that the defendant had deposited large sums in their hands for the purchase of options upon representations made by the firm, and further said—

"that certain articles, that is to say, wheat, oats, corn, lard and pork, would probably and almost certainly bear a higher price in the market within a short time than they then bore in such market. That by making contracts agreeing in form to purchase such articles for future delivery at the end of said time above named *he would*, without receiving or handling, or actually purchasing or paying for the said articles, or any of them, realize large profits from the difference between the price said articles then bore in the market and the price they would probably bear at the end of the time aforesaid; that it would not be necessary, nor was it expected, or in any way understood, that either this defendant or the plaintiffs as his brokers should ever actually see, touch, handle, pay for, or own, receive, or possess any of the said articles. That the large sums of money placed by this defendant in the hands of said plaintiffs should be used to

keep good the margins, so called, upon the said articles purchased; that is to say, said plaintiffs were to purchase, in their own names, the said 'options,' but the same were to be so purchased and held by them for the use and benefit of this defendant. If the said articles should rise and increase in value the said profits should be his, and if they should decrease in value the loss would fall on him.

"That said plaintiffs should so purchase such articles for such future delivery to a nominal amount of many times the money so placed by this defendant in their hands. The said sum of money so placed by this defendant in the hands of said plaintiffs being equal to about      per cent. of the whole nominal value of the said articles so to be bought for future delivery as aforesaid, and the said moneys were to be held by said plaintiffs to protect them from loss in case of a depreciation in value of said articles, and the same was adjudged and deemed by them sufficient for that purpose. That afterwards and during the month of February, 1879, this defendant placed in the hands of said plaintiffs certain other large sums of money with which to purchase other options, in all amounting, including said moneys so first placed in their hands as aforesaid, to the sum of about three thousand one hundred and fifty dollars. That all of said moneys were paid by this defendant to them, to be used, and were in fact used as he is informed, solely for the purpose of making and keeping good the 'margins' so called, to protect said plaintiffs from loss in case of depreciation in the market value of such articles so to be bought by them on his account as aforesaid. That this defendant has no knowledge or information sufficient to form a belief as to whether the statement in said complaint contained of articles bought by said plaintiffs for him. is a true statement of the amount of such articles actually purchased or not, and he therefore denies the same and asks that said plaintiffs may be required to make proofs thereof; and of the prices agreed to be paid therefor, and the prices for which the same was sold if it was ever sold. That on the 11th day of March, 1879, he gave said plaintiffs notice that he had no more money to put up or pay over for margins, and that he would not pay or advance another dollar, or invest, or be, or become liable for another dollar in or about the transactions or any of them. That as he is informed and believes, all of the articles bought or agreed to be bought or bargained for by said plaintiffs,

for him or on his account, were bought and carried in the names of said plaintiffs and not in the name of this defendant; that it was within their power at any time to close out and end the said transactions."

The answer further charged that if the firm had closed up the transactions, there would have been no loss, and it denied any liability. It further charged, as to both counts, that the transactions were gambling and void.

At the trial the parties were the principal witnesses, and sundry questions upon the evidence arose, which are explained in the opinion of the court, so far as they are important. The jury returned the following general and special verdict:

"We, the jury sworn and empanelled to try this case, find for the plaintiffs, and assess their damages at the sum of five thousand six hundred and fourteen and $\frac{46}{100}$ dollars. And we further find, in answer to certain special questions submitted to us by the court, as follows:

"First. Did the defendant notify, the plaintiffs, or either of them, on or about March 11th, 1879, that he would not be responsible for any money beyond the amount of money they then had in their hands belonging to him? Answer. Yes.

"Second. If he did so notify them, or either of them, state, if you are able, whether the amount of money he then had in their hands was sufficient to cover all losses he had then sustained? Answer. We are unable to state.

"Third. If you find that the defendant did so notify the plaintiffs as submitted in the first question, was there any mutual understanding or contract between the plaintiffs and defendant on or about March 11th, 1879, that the defendant should not be held liable on the contracts made on his behalf by the plaintiffs beyond the amount of money then already placed by the defendant in the plaintiffs' hands? Answer. No.

"Fourth. If you find there was such a contract or understanding between the parties as is mentioned in the last question, did the defendant, by his subsequent acts, declarations, directions, or conduct, waive the same and become liable for further losses incurred over and above the money so placed in plaintiffs' hands? Answer. Yes."

The case was brought here on a writ of error. The ma-
terial assignments of error were the third and fourth.

"Third. Said court further erred in withdrawing from the
said jury and refusing to allow said jury to consider the defence
set up by said defendant in the answer herein, that the contracts
upon which the said action was based were gaming contracts and
illegal and void.

"Fourth. The court further erred in holding and deciding that
there was no evidence in said cause to impeach the legality of
said contracts, and the said contracts were valid and binding."

*Mr. W. E. Carter*, for plaintiff in error.

*Mr. C. B. Lawrence*, and *Mr. Francis H. Kales* for defend-
ants in error.

Mr. Justice Miller delivered the opinion of the court.

Smith and Lightner, plaintiffs in the circuit court, recovered
against Roundtree, plaintiff in error, a judgment for $5,614.46
for services rendered and money advanced by them, as brokers
and members of the Board of Trade of Chicago, for Roundtree
at his request.

The case was tried before a jury, the parties being the princi-
pal, if not the only witnesses, and their testimony, with some
correspondence by letters and telegrams, was all the evidence.

The record presents but two questions necessary to be decided.

It was alleged by the defendant that on the 11th of March,
1879, he had notified the plaintiffs in writing that thereafter he
would advance them no more margins, and would not be re-
sponsible for any losses on contracts made by them in his
name. To which their answer was a denial of such instruction,
and an allegation that, if it had been given, it was subsequently
withdrawn and waived by other instructions and actions of
defendant.

Specific questions on this subject were submitted by the
court to the jury, under the practice allowed by the Wisconsin
statute.

Some objection is made to the form of some of these ques-
tions, which we do not think necessary to consider here, for

the fourth question and the answer of the jury to it render the other questions and answers immaterial. That question and answer are as follows:

" Fourth. If you find there was such a contract or understand-ing between the parties as is mentioned in the last question, did the defendant, by his subsequent acts, declarations, directions, or conduct, waive the same and become liable for further losses incurred over and above the money so placed in plaintiffs' hands? Answer. Yes."

It was undoubtedly competent for defendant to withdraw, waive, or countermand his former order on this subject, and this could be done verbally or by actions, and need not be in writing, and the fact found by the jury that he did so, renders his former notice wholly immaterial to the issue.

The counsel for defendant resisted recovery against him, on the ground that the sales and purchases made for him by plaintiffs were gambling contracts on the prices of the various articles of produce to which they related, never designed to be actually performed by delivery, but the damages were to be adjusted and payments made and accepted, according to the difference between the contract price and the market price at the date fixed for delivery. And on this subject he asked certain instructions of the court, which were refused. The court also charged the jury that there was no evidence on this subject which they could consider. An exception was taken to this ruling, and a bill of exception purports to embody all the testimony.

The evidence of the defendant on this point was that he gave the instructions to buy. He says: " I could not say that I had any understanding on the subject of the nature and character of the board of trade deals, whether the property was to be actually delivered or whether it was to be settled for."

It is obvious, therefore, that so far as plaintiff, one of the parties to all these contracts, which he now impeaches, is concerned, they were not gambling contracts, and that he had no

understanding or agreement, expressed or implied, that they were bets upon the future price of the article.

The other party to these contracts, or rather parties (for the contracts were numerous), are not produced, nor their testimony given, and there is no direct evidence that any of them either bought or sold with any other purpose than to perform the agreement as its terms bound them.

The plaintiffs, in answer to questions on this subject, say that in no instance had they any agreement with the parties to the contracts made by them for Mr. Roundtree, that performance was not expected or intended, but a mere adjustment of differences, and they say that actual delivery of the article was made in some of them. So that as to these contracts, in regard to which the services were rendered and money advanced by plaintiff for defendant, there is no evidence whatever that they were not *bona fide* contracts, enforceable between the parties, and made to be performed.

Evidence was given that a very large proportion of all the contracts made for the sale of produce at the board of trade of Chicago, were settled by payment of differences, and that nothing else was expected by the parties to them, and the number of these in proportion to the number of *bona fide* contracts, in which delivery was expected and desired, is said to be so large as to justify the inference that it was so in these cases.

But since the plaintiff testifies that he had no such understanding, since nothing is proved of the intention of the other parties, and since the contracts were always in writing, we do not think the evidence of what other people intended by other contracts of a similar character, however numerous, is sufficient of itself to prove that the parties to these contracts intended to violate the law, or to justify a jury in making such a presumption.

It is also to be observed that the plaintiffs in this case are not suing on these contracts, but for services performed and money advanced for defendant at his request; and though it is possible they might, under some circumstances, be so connected with the immorality of the contract as to be affected by it if proved, they

are certainly not in the same position as a party sued for the enforcement of the original agreement.

Without pursuing the subject further, we are of opinion that there was no evidence on this subject which ought to have been submitted to the jury, and the court was right in withdrawing it from their consideration.

We see no error in the record.

*The judgment of the circuit court is affirmed.*