CASE 54—PETITION EQUITY—JAN. 9.

# White v. Wilson's Administrator.

### APPEAL FROM GRAVES CIRCUIT COURT.

1. GAMING—RECOVERY OF MONEY LOANED TO PAY LOSSES.—One who is a member of a club at which gaming is indulged in, and at which there is a "take-out" to pay expenses of the club and for meals, drinks, and cigars of the members and guests, has such an interest in the game as will prevent his recovering money loaned to one to pay losses, although he was not actually engaged in the game in which the losses were sustained.

BURNETT & DALLAM FOR APPELLANT.

1. Money advanced by one at request of another, to pay losses already incurred in gaming, where the one advancing the money was not engaged in the gaming, may be recovered. (Pope v. McKinney, 3 B. M., 93; English v. Young, 10 B. M., 141; 3 Dana, 51; 7 J. J. M., 16.)

   This case is also distinguished from Triplett v. Seelbach, 91 Ky., 30.

S. S. BLITZ ON SAME SIDE.

1. The appellant was not a participant in the game, was not interested in it in any way, and neither won nor lost any of the money sued for, but simply at the request of Wilson, after the gaming was over, advanced the money to pay his losses. Such a transaction is not embraced by or contemplated in our statutes prohibiting the recovery of money lost in gaming. (Pope v. McKinney, 3 B. M., 93; English v. Young, 10 B. M., 141; Lyle v. Lindsey, 5 B. M., 123.)

2. This case is essentially different from the case of Triplett v. Seelbach, 91 Ky., 30. In that case it was shown that Seelbach and others operated the game as partners, and as such received the "take-out" and profits, while in this case it appears appellant had no interest whatever in them.

ROBBINS & THOMAS FOR APPELLEE.

1. The evidence of appellant shows that the "take-out" was used in paying the expenses of the club, of which he was a member, and that any surplus after payment of expenses went to the credit of

the club. He was, therefore, interested in the game, and can not recover. (Triplett v. Seelbach, 91 Ky., 30.)

BURNETT & DALLAM IN PETITION FOR RE-HEARING.

1. Only issues raised by the pleadings can be considered in determining a cause. In this case there was no pleading, but merely the filing of the claim against the decedent's estate. The claim was allowed by the Master Commissioner and appellee filed exceptions thereto on two grounds only. First, because it was for money won at cards from Wilson by White, and, second, because it was for money loaned by appellant to Wilson, knowingly, for the purpose of being bet on a game of cards. These two exceptions raise the only issues in this case, and appellee has failed on each of them.

JUDGE DURELLE DELIVERED THE OPINION OF THE COURT:

This suit was brought by J. T. Wilson's administrator against his heirs and creditors to settle his estate. Among the claims filed with the commissioner was a note in favor of appellant for $138.50 and an account in his favor for $325, aggregating $463.50. They were proven in the usual form, the additional witness to the account being T. H. Glover.

Exceptions were filed to the claims upon two grounds. First, that the claims were all for money borrowed from appellant for the purpose of betting on and playing at a game of cards called "poker," which purpose and use of said sums was known to appellant; or, second, that appellant won said sums from Wilson at poker, and that one or the other of said grounds was true, but appellees did not know which ground was true. The appellees took the deposition of the appellant, and the exceptions were sustained by the court below. From the judgment sustaining the exceptions this appeal is prosecuted.

It appears that the money was lost in the Union Club, of which appellant was a member, on two different occasions, and in games in which he took no part as player. The sole testimony introduced is that of the appellant himself taken by the appellee, and, as was to be expected, he was a most reluctant witness upon many points.

He states that he paid out the money for which the note was given less than three years before, and also the money claimed in the account at the request of Wilson, to different parties to whom Wilson had lost it at cards at the Union Club; that he waited on the gentlemen engaged in the games at various times, but did not manage the game more than other members of the club; that there was a "take-out" in the game played at the club in proportion to the value of the hands held—that is to say, so much for "jackpots," so much for "two pairs," so much for "fours," etc., the amount of the "take-out" being taken as the game progressed from the amount won on any hand above a certain value, and out of this "take-out" was defrayed the expense of the meals, drinks, and cigars; that it all went into a fund, and went to the credit of the club if there was any surplus; that this taking out was done by any member of the club who happened to be convenient; that sometimes if there was any money left appellant took charge of it, and sometimes the colored boy, Dave Evans, who waited on the club members and visitors for what they might choose to give him; that he could not say from recollection who were

the parties to whom he paid the money at Wilson's request, and did not know that he could name one man to whom he paid money for Wilson.

According to appellant's statement the game was running continuously at that time. There was a dining-room for the exclusive use of members and friends invited there by members, and the meals were furnished from the hotel below, charged to the club and paid out of the take-out. Appellant on a number of occasions paid Mr. Seelbach his accounts for room rent, eatables, etc., but declines to give the names of other members who did so. He states that Dave Evans did so at times, but it is obvious that the payments by the colored steward must have been made under direction. Books were kept at the club showing the indebtedness of those who obtained checks or counters on credit. The book from which the account was taken was kept there but it was not produced, and appellant professes ignorance of its whereabouts. When asked if he had any interest whatever in the take-out he says not personally "any more than any other members of the club; I suppose I got my part in eating, drinking and smoking."

The only evidence as to the time of the request by Wilson to pay, and the time the payments were made, is that of appellant, who states that it was in both instances after the losses had been incurred. Appellant takes occasion to state once or twice that the club was incorporated.

We are bound from the evidence to conclude that all

the payments were made at Wilson's request and for his benefit after the losses were incurred.

Numerous cases have been cited for appellant to the effect that in cases in which money has been advanced to pay losses at cards after the losses had been incurred the money is recoverable. But we think there is a marked distinction between those cases and the case at bar.

Whether the Union Club was a corporation or not (and there is no competent evidence in this case that it was) the fact remains that appellant was to some extent at least managing it, and for his own profit, which was to come out of the "take-out." This he received either as a partner or as a stockholder, and for the purposes of this opinion it makes no difference, for the law does not permit corporations to be formed to carry on gaming, and as soon as the corporation, if any there was, was used for that purpose, the stockholders so using it ceased to act as stockholders, and acted individually and for themselves. In this view there can be no doubt of appellant's interest in the take-out.

As was well said by Judge Bowden, in Triplett v. Seelbach, 11 Ky. Law Rep., 283, "As each winning hand is played the manager is there claiming and taking his share of what is won by that hand. The nominal winner—he who actually plays the hand—has no right to take as his own all that his hand won; there, as it lies, it belongs jointly to him and to the manager; the latter has as much right to his share, called a 'take-out,' as the player has to the residue. Thus he

who plays the winning hand wins for himself and the manager. It is the most effective of all joint enterprises; the manager is always the partner of the winner.  *  *  *  What is the difference in principle between such a scheme and one in which the manager arranges with one player only for a percentage of his winnings? His right in either case is to the winnings as such; it is in them that he has an interest. Neither in the one case nor in the other can it be material to inquire what induces the player to agree to such a participation in the amount won. If the manager should furnish the money to be used in the game that would be the inducing fact. Why is it not so, if he furnishes gilded parlors, sumptuous meals and sparkling wines? The question is not as to what moves the player to consent that the manager shall be a participant with him in what he wins; the fact of participation is alone important."

In our judgment appellant was a joint wrongdoer with the winners from Wilson, in that he had an interest in the winnings, no matter how small.

Under the principles laid down in the case cited above and in the same case when decided in this court, if Wilson had paid his losses at the time they were incurred to the various winners, he might have recovered them from White.

Said Judge Bennett in the same case in this court, 91 Ky., 33: "It is not the extent but the community of interest that makes wrongdoers responsible for the whole wrong. If each is to receive a certain

amount of the result of the unlawful enterprise this gives them such a community of interest as to render each responsible for the whole amount received."

The judgment of the lower court is, therefore, affirmed.